## JOHNSON v. GOODBALLET et al.
### No. 8951.

Circuit Court of Appeals, Eighth Circuit.

Feb. 2, 1931.

John S. Marsalek, of St. Louis, Mo. (Allen, Moser & Marsalek, of St. Louis, Mo., on the brief), for appellant.

James R. Claiborne, of St. Louis, Mo. (Bishop & Claiborne, of St. Louis, Mo., and Vaughn & Nevins, of Carlinville, Ill., on the brief), for appellees.

Before KENYON and GARDNER, Circuit Judges, and MUNGER, District Judge.

KENYON, Circuit Judge.

This suit is one in equity, brought by Leonora Johnson, appellant, under section 57 Judicial Code (28 USCA § 118), to remove a cloud upon title to certain United States bonds and treasury certificates of the value of approximately $15,000, to which she claims ownership by virtue of an alleged gift causa mortis from her sister Emma Dalton. Appellees are Lula Ruyle, sister of appellant and of Emma Dalton, deceased, and Reecy E. Goodballet, husband of a daughter of Lula Ruyle, and executor of the estate of Emma Dalton.

By cross-petition appellees asked that appellant be ordered to deliver the bonds and certificates to Reecy E. Goodballet, executor.

The trial court found there had been no gift to appellant, and dismissed the suit, ordering her to deliver the property in question to the executor. This appeal results.

The law as to gifts causa mortis is well settled. Such gifts are sustained by the courts only where the evidence is clear and satisfactory as to all of the essential elements thereof. 28 Corpus Juris, § 140, p. 704.

This court in Kling v. McCabe, et al., 36 F.(2d) 337, 339, said: "It has often been decided that the evidence to establish gifts causa mortis, in cases of this nature, must be clear and satisfactory, and will be closely scrutinized." Deathbed donations should be scrutinized by the courts with great care.

We are concerned, as was the trial court, only with the question of whether the evidence is so clear and convincing as to establish the alleged gift causa mortis of these bonds and treasury certificates to Leonora Johnson. Some of the necessary elements of such a gift are undoubtedly here. Others are in doubt, namely, the intention to make such gift, the delivery of the property, and the acceptance of the same by the donee as a gift.

The appellate court is always at a disadvantage in reviewing a fact question determined by a trial court, as it has not had the opportunity to observe the witnesses. It is ofttimes not difficult to determine from the actions and attitude of a witness whether the truth is being spoken, but when the story is in cold print the search for the truth is more difficult.

The issue here makes necessary some review of the evidence. Leonora Johnson, appellant, Lula Ruyle, appellee, and Mrs. Emma Dalton, deceased, were sisters. Mrs. Dalton and Mrs. Ruyle lived at Scottville, Ill., a village of two hundred people. They belonged to the same church and their rela-

tions were more or less intimate during the course of the years. Mrs. Ruyle had three daughters, all married at the time of the events here involved, and all of whom were witnesses. Miss Johnson had been living at St. Louis for fifteen years prior to the death of Mrs. Dalton. She was forty-nine years of age, a business woman, bookkeeper by occupation, and also was an office manager. Mrs. Dalton was married to Dr. William B. Dalton, of Scottville, who died in March, 1924. She continued to reside at Scottville after her husband's death, and Miss Johnson visited her quite often. The inventory of her estate showed as assets a lot in Scottville, an automobile, household goods, cash, a note of $1,000 known as the Jackson note, $12,300 of United States Liberty bonds, $2,700 of United States treasury certificates. These bonds and certificates are the matters in controversy.

In September, 1919, Emma Dalton executed a will, providing $3,000 for her father to invest in a house and lot, and also for the division of the balance of her property between her two sisters, Mrs. Ruyle and Miss Johnson. As showing her feeling at that time toward her sisters, section 2 of said will is important. It is as follows:

"I further give, devise and bequeath to my beloved sisters, Mrs. Lula Ruyle of Scottville, Illinois, and Miss Leonora Johnson, of St. Louis, to be equally divided between them, the remainder of by estate of every kind and nature and wheresoever situated."

She appointed her nephew, Reecy E. Goodballet, as executor of the will. That will was never changed and was filed with the county clerk after her death.

December 4, 1925, Mrs. Dalton became very ill. The family physician, Dr. Berryman, was called, and attended her until she was taken to the hospital at Jacksonville, Ill., on December 7th, accompanied by Mrs. Ruyle. Miss Johnson was notified at St. Louis by some of Mrs. Ruyle's daughters, and she went to the hospital. Mrs. Dalton during this time said she was very sick and would not get well. She had staying with her a student nurse from the hospital, one Emma Nevins, who had known her for two years and had lived at her home one winter when attending school. She assisted in getting Mrs. Dalton ready to be taken to the hospital. She testified that the only instruction given her by Mrs. Dalton about getting her things ready was about wrapping some papers. She told her to go to the dresser; that she had

some papers she wanted her to wrap and put in the traveling bag (these included the bonds and the certificates). Miss Nevins did this. She could not state how many bonds there were. They were lying loose in the dresser drawer. She placed them in the traveling bag as directed, which was taken with Mrs. Dalton to the hospital. There was some money in the drawer which, under the direction of Mrs. Dalton, Miss Nevins took and deposited in the Scottville State Bank the day Mrs. Dalton went to the hospital. There was also among her papers a note of $1,000 known as the Jackson note, to which we advert later.

Miss Nellie L. Rimbey was a nurse at the hospital where Mrs. Dalton was taken at Jacksonville. Hers is the testimony largely relied on to establish the gift. When Mrs. Dalton was brought to the hospital, Miss Rimbey says she was critically ill, though rational and conscious; that she repeated many times, "I am mighty bad off and I am not going to get well." She testified as follows as to the events of December 7th:

"Q. When you say 'Mrs. Dalton,' you mean the sick woman, Emma Dalton? A. Yes.

"Q. All right. A. And Mrs. Dalton told Miss Johnson to go to the closet, where her traveling bag was, and to get her papers, and to keep them for herself.

"Q. Now, what did Miss Johnson do, when Mrs. Dalton told her that? A. Miss Johnson went to the closet, and she brought the traveling bag out, arranged a chair just outside the closet door, she took them out of the——

"Q. Was that in the presence of Mrs. Dalton? A. Yes.

"Q. What did you see her take out of the traveling bag? A. She took out a package.

"Q. What was it wrapped in, if anything? A. Wrapped in a newspaper, and she spoke of it as 'Her papers.'

"Q. Then, after taking the package out of the suitcase, what did Miss Johnson do with it? A. Well, Miss Johnson kept them. Mrs. Dalton had told her to keep them for herself. A. Yes."

She also testified that Mrs. Ruyle was present at this conversation, standing at the foot of the bed, but said nothing when Mrs. Dalton told Miss Johnson to keep the papers for herself. This conversation was on the day before Mrs. Dalton died.

Another witness for appellant was Bertha H. Neece, who knew the parties and who tes-

tified she saw Mrs. Dalton in the fall of 1925 at a Farmers' Institute; that Mrs. Dalton said with reference to her property, "The Ruyles will never get anything what I have." She did not say her sisters but said, "The Ruyles."

These were the witnesses produced to prove a gift causa mortis. In addition thereto, a series of letters written by Mrs. Dalton to appellant from June 26, 1924, to April 22, 1925, were introduced. In these letters Mrs. Dalton speaks of the kindness of her sister, Miss Johnson, to her; that she would be rewarded therefor, and finds fault with her sister, Mrs. Ruyle, because she had not done enough for their indigent father, expressing sentiments that she had done all she would do for her sister, Lula. The great importance which appellant attaches to these letters we think is hardly justified. Mrs. Dalton in one of the letters says: "Well sis I expect you will be getting tired of so much gossip so had better quit for this time." These letters are full of small town gossip and show some feeling at times on the part of Mrs. Dalton toward Mrs. Ruyle because she had not done more to help their father, and also show a resentment at some of the rough language used by the Ruyle family toward Miss Johnson and Mrs. Dalton. One of the letters speaks of receiving a will. It does not appear as to just what this refers, but it shows that Mrs. Dalton was giving some consideration to the subject of a will. In one letter she states that she was going to make a will in favor of Miss Johnson because "you have done more for me than any of my folks." None of these letters state that Mrs. Dalton was planning to give the bonds in question to Miss Johnson. Of course, every one knows that family relations at times may become strained; that sisters constantly thrown together may irritate one another's nerves, but when the test comes blood ties are close and strong, and notwithstanding little troubles that for the moment may seem large, sisters generally stand together in their affection one for another.

Emma Nevins, who had no interest in the case and was related to none of the interested parties, testified that Mrs. Ruyle and her daughters visited Emma Dalton weekly and Mrs. Dalton visited them; that she never heard any quarreling between Mrs. Dalton and Mrs. Ruyle's daughters; that Mrs. Ruyle's daughters came to Mrs. Dalton's house for meals—some of them there almost every week end. In 1925 Mrs. Dalton ate Thanksgiving dinner at the Ruyles. We do not think the letters very weighty testimony on the question of intention on the part of Emma Dalton to make a gift of the property in question. If there was any particularly harsh feeling on the part of Mrs. Dalton toward Mrs. Ruyle, it would be strange that she appointed the son-in-law of Mrs. Ruyle as executor of her will and never made a change in that regard.

The strong testimony for appellant is that of Nellie Rimbey, and against it must be placed the various circumstances developed by the evidence of appellees.

It is a strain on credulity to accept at face value some of the testimony of the three daughters of Mrs. Ruyle. They seem to have overtestified. They covered every point necessary to refute the testimony of appellant. It is strange and quite unnatural that they were continually talking with Mrs. Dalton about the division of her property, and with Miss Johnson about the division of the bonds. Of course, in this small village of two hundred people they had talked and discussed the case one with another over and over again, and their stories may be in part the outgrowth of such discussion. It is no indication of cynicism to view their testimony with doubt. If the case for appellees stood alone upon their evidence we would not be willing to determine it adversely to appellant. There is undoubtedly some truth in their statements and much of exaggeration. Some of their statements are corroborated by others, as in the instance of their mother making a list of the bonds. We refer briefly to some of the testimony of these three witnesses.

Hazel Ruyle Crane testified as to getting word in early December that her Aunt Emma (Mrs. Dalton) was sick, and hurrying over there her aunt put her arms around her neck and told her she was going to die, and said, "I have left a will, * * * and all that I have, I have left equally to your mother and your Aunt Nora" (meaning Miss Johnson). She also stated that she went to the hospital but arrived there after her aunt was dead. We quote from her testimony: "As we entered the front door, my mother was sitting, prostrated with grief, in a seat, and my Aunt Nora came to me—Miss Johnson—she came to us and said, 'Your Aunt Emma passed away a little while ago.' Of course, I began to cry, and she says, 'Don't cry. She died such a beautiful death.' She says, 'She even told us just how she wanted to be buried.' She says, 'There is no need to worry.' She

says, 'All that she had, she left fifty-fifty to your mother and I.'"

Viva Ruyle Goodballet, another daughter, testified that her aunt told her she was very sick; that she was ready to die, and her business was fixed just like she wanted it. She testified also that on the evening of December 10th, the day of the funeral of Mrs. Dalton, her aunt, Miss Johnson, said, "Aunt Emma's business was fixed lovely," "that it was just the nicest business she had ever fixed up," "that everything had been given to her and mother, to share fifty-fifty," that she asked her: "Well, did she give anything to anybody else?" And she said, "No, child. There wasn't anybody else to have anything. Just your mother and I, and we share fifty-fifty."

Glena Ruyle Kerstein, another daughter, testified that she went to the hospital as soon as her aunt was taken there; that she had a conversation with her respecting the bonds in question, and that her aunt asked her to get the bonds and take care of them, but she did not want to do so; that her aunt told her to look for the key and look for them.

These children of Mr. Ruyle testified also that appellant told them when they got the bonds she wanted them to make their mother doctor herself.

From this unsatisfactory testimony we turn to that which seems rather conclusive. The most important is that of Dr. Berryman. He was a physician at Scottville; had known Emma Dalton nearly all her life. He was called to see her at the time of her last illness and acted as her physician. He called upon her three or four times a day up to the time of her death. When they were ready to take her to the hospital, he talked with her about her property and asked if she had her worldly affairs fixed in the way she wanted them to be. She told him she did. He told her she stood a chance to get well by an operation, but without an operation she would die, and he asked, "In case of impending death, would you want to make any change?" She replied: "I don't want any change, because I have my will made, and I don't want any change in it." She stated that she wanted her two sisters, Lula and Nora, to divide equally in her estate in case she died. That conversation was at nine o'clock on the morning of December 7, 1925, made to the family physician having charge of her in a serious illness that resulted in her death. It certainly is more direct and carries more weight than the statements of Miss Rimbey. The evidence of Dr. Berryman is not discussed in appellant's

brief. It is certainly most persuasive as to the issues in this case.

Other important testimony is that of Mr. Fred J. Oeltjen, which was taken by deposition. He was a very old man and there are some incongruities in his evidence, but he was an absolutely disinterested person. He had handled the estate of Mrs. Dalton's husband before the probate court of the county, and there is no reason to question his testimony. He says that about three years after Mr. Dalton's death Miss Johnson and Mrs. Ruyle came to his office and asked him to settle their sister's estate; that they told him about the $16,000 in Liberty bonds; that Miss Johnson had the bonds with her and that she said the bonds were given to her by her sister to put in some bank for safe-keeping; that one-half of them were Mrs. Ruyle's; that they came back the second time and he had a conversation with Miss Johnson; that he later wrote Miss Johnson that the Executor had given bond and qualified and that she ought to turn the bonds over to him; that he was entitled to these bonds; that he received no answer to the letter; that Miss Johnson told him that Mrs. Dalton had told her that "the bank in Scottville was not very safe and she wanted her to put them in a safe bank."

Miss Johnson as a witness in rebuttal contradicted the various statements of Mrs. Ruyle's daughters and of Mr. Oeltjen, and testified that Emma Nevins delivered to her the bank book and the keys after Mrs. Dalton's death, with this statement: "Nora, here is Mrs. Dalton's keys. She told me that if anything happened to her, that I should give those keys to you, and here is her passbook, showing that I deposited $175.00 in the bank at Scottville."

Miss Nevins took the stand and denied this statement of Miss Johnson, and said she never had any keys.

The evidence that Miss Johnson rented a safety deposit box after she had received these bonds and that the box was marked "Mrs. Emma Dalton," "Trustee, Leonora Johnson," we do not regard as of great importance. She was legally a trustee of the property up to the time of Mrs. Dalton's death, even if it were a gift causa mortis.

Referring to the testimony of Miss Rimbey, the trial court points out that Mrs. Dalton did not tell her to get Liberty bonds, government bonds, or government securities, but "get those papers," and that there is some doubt as to what papers it was the purpose

938

of the deceased to deliver. It is without question that there was a $1,000 note known as the Jackson note among these papers. Just why appellant does not claim that note as well as the government securities we are quite unable to understand. If there was a gift of the government securities, there was a gift of the note, but this note has been paid to the executor without any protest on the part of appellant, as far as this record shows. The testimony of Miss Neece that Mrs. Dalton had told her, "The Ruyles will never get anything what I have," does not add much weight to appellant's side of the controversy. Mr. Ruyle had a number of brothers in the town. Mrs. Dalton's sister, Lula, was a Ruyle only by a marriage. Reference may have been made to the husband and his brothers not getting anything, which is not out of line with the feeling of many sisters toward their sisters' husbands.

It cannot be lost sight of that Mrs. Dalton was an experienced business woman. She had much to do with settling her husband's estate. One of the letters in evidence shows her sagacity in handling her property. Up to the very last her mental condition was unimpaired. She arranged to have Dr. Brown come to the hospital to consult about the necessary operation. She had made her will six years before; provided how she wanted her property divided, namely, between her two sisters after payment for a home for her father. Certainly in view of her business sagacity and experience and with her mental condition unimpaired as it was almost up to the very time of her death, considering her arrangement of other matters at the hospital, if she had desired to make a different disposition of her property from that contained in the will she would have done so. The correspondence with Miss Johnson shows that she had thought of making another will, but her mind never reached a determination on that question.

Taking all of these matters into consideration, and adding thereto the testimony of Dr. Berryman and Mr. Oeltjen, and of the daughters where they are corroborated, it would seem impossible for any court to say that the evidence was so clear and convincing in the light of all the circumstances that it would be sufficient to establish a gift causa mortis. The burden of proof was upon appellant. It has not been sustained.

We are satisfied that the trial court could have reached no other conclusion than the one it did, and its decree is affirmed.